UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

KENNETH BRYNIEN, as PRESIDENT of the NEW YORK STATE
PUBLIC EMPLOYEES FEDERATION, AFL-CIO,
*Plaintiffs,*

-against-                                                    10-CV-00544

                                                             (LEK)(DRH)

DAVID A. PATERSON, as GOVERNOR of the STATE OF NEW YORK, et al.,

*Defendants.*

---

DANNY DONOHUE, as President of the Civil Service Employees
Association, Inc., Local 1000, AFSCME, AFL-CIO, et al.,
*Plaintiffs,*

-against-                                                    10-CV-00543

                                                             (LEK)(DRH)

DAVID A. PATERSON, as Governor of the State of New York, et al.,
*Defendants.*

---

PHILLIP H. SMITH, as President of UNITED UNIVERSITY
PROFESSIONS, et al.,
*Plaintiffs,*

-against-                                                    10-CV-0546

                                                             (LEK)(DRH)

HONORABLE DAVID A. PATERSON, as Governor of the Stat
of New York, et al.,
*Defendants.*

---

BARBARA BOWEN, as President of PROFESSIONAL STAFF
CONGRESS/CUNY, et al.
*Plaintiffs,*

-against-                                                    10-CV-00549

                                                             (LEK)(DRH)

THE STATE OF NEW YORK, et al.
*Defendants.*

---

STATE OF NEW YORK    )
                     )   ss.:
COUNTY OF ALBANY     )

ROBERT L. MEGNA, being duly sworn, deposes and says:

　　　　1.　　　I am the Director of the Budget for the State of New York.  I am fully familiar

with the facts and circumstances related to this proceeding.

2.      I make this affidavit in support of defendants' opposition to the plaintiffs' motion

for a preliminary injunction to prevent the State from furloughing certain State employees for

one day, pursuant to Chapter 75 of the Laws of 2010, to require the State to pay all State

employees the 4% raises provided for their collective bargaining agreements for this fiscal year,

and to fully fund all contributions to the employee benefit fund ("EBF") for Civil Service

Employee Association, Inc., Local 1000, AFSCME, AFL-CIO ("CSEA").

3.      I have served as Director of the Budget since May 2009.  From January 2008 until

I became Director of the Budget, I served as the Commissioner of Taxation and Finance for the

State of New York.  During my career, I have also worked as the Chief of the Economic and

Revenue Unit of the Division of the Budget ("the Division" or "DOB") and as the Director of

Fiscal Studies at the Ways and Means Committee of the New York State Assembly, amongst

other positions.

4.      As Director of the Budget, I exercise all of the powers and duties conferred upon

me by New York State law.  Among other responsibilities, I am vested by Executive Law § 180

with the duty to assist the Governor in formulating the Executive Budget and coordinating and

supervising the State's expenditures and fiscal operations.

5.      As explained in further detail below, the State of New York is in the midst of a

severe economic downturn that is national in scope.  The State's fiscal challenges have resulted

in an unprecedented mismatch between planned spending commitments and the receipts

available to pay for them (the "budget gap").  At this time, DOB projects that the State must

close budget gaps of approximately $8.5 billion in Fiscal Year ("FY") 2010-11, $14.6 billion in

FY 2011-12, $18.5 billion in FY 2012-13, and $20.8 billion in FY 2013-14.  The gaps that must

be closed follow two years in which the State has taken a broad array of significant measures to

2

reduce spending and increase revenues. New York and the majority of states around the county have taken unprecedented actions to respond to the fiscal crisis, including furloughs and other actions to reduce expenditures. New York has even padlocked state parks. At this point, without a final enacted budget for FY 2010-11, the Governor has very limited administrative options for dealing with the fiscal crisis.

6.      The economic crisis in New York has resulted in a lack of sufficient revenue which, in turn, has produced a cash crisis. The actions challenged in this proceeding respond to both the State's budget gaps, and to the limited availability of cash to pay the State's obligations. The furlough proposal is one aspect of a multi-faceted approach to address the State's budget gaps, and the delay in payment of the general salary increase to unionized employees and the delay in making contributions to the Employee Benefit Fund are intended to alleviate the State's cash shortages.

7.      At various times over the past year the State has been at significant risk that it would run out of cash if all payments were made as planned. If the State actually were to run out of funds, the consequences would be chaotic and potentially devastating. As a result the Division has been compelled to engage in extraordinary measures to manage cash, such as withholding payments until such time as the State has the funds available to make them.

8.      The first such cash crisis manifested itself in December 2009. At one point during that month, the Division estimated that the General Fund (the main operating fund of the State) would be in deficit by $1.4 billion if all payment obligations then due were met. At that time, Governor Paterson directed that I delay payments of school aid in order to ensure that the State had sufficient moneys on hand to allow New York to meet all its other obligations. Although those payments were eventually made when I determined there was sufficient cash on

hand to do so, the withholding was challenged in a lawsuit, *Becker v. Paterson*, Supreme Ct.
Albany County, Index No. 2552-08, that is still pending.

9.      In March 2010, I was forced to withhold the pre-payment of the $2.06 billion
final installment of school aid for the state fiscal year, and delay the payment until June 1 in
accordance with Education Law §3609-a(5). This delay was necessary to ensure that the State
had sufficient cash on hand to meet its obligations and otherwise avoid chaos. This action has
also been challenged in litigation. *Becker v. Paterson*, Supreme Ct. Albany County, Index No.
2637-10.

10.     At present, the State lacks an enacted budget; the Executive's budget proposal,
submitted in January pursuant to Article VII of the New York State Constitution and New York
State Finance Law, is pending before the Legislature. The State is operating week-to-week
pursuant to emergency appropriation bills. To date, these emergency appropriation bills have
limited expenditures wherever possible, by (among other means): (a) providing agencies with
the minimum appropriations necessary to continue operations; (b) limiting the State funds
available for most construction contracts; and (c) withholding funds for contractual payments,
such as the State's premiums for the New York State Health Insurance Program for public
employees. A contractors' group has announced that it has brought suit to challenge the absence
of any appropriations to fund particular construction contracts. Moreover, from the start of the
fiscal year until the issuance of the temporary restraining order in these actions, the State did not
provide the 4% salary increase set forth in various collective bargaining agreements with the
state workforce.

11.     The emergency bills have not provided the long-term savings or revenue
enhancements to close the budget gap in 2010-11. The State entered the current fiscal year with

4

a significant deficit, and is facing a long term and growing fiscal deficit. In light of this situation, the State is compelled to look for further savings wherever they may be obtained, both to close the budget gap and to ensure adequate cash flow to maintain state operations while improving the State's finances in this fiscal year.

12.     Given the severity of our current cash flow position, it is likely that the State will not have sufficient funds available on June 1 to make all of the school aid payments currently due on that date. Choices as to whether to withhold particular payments arise from a week by week assessment of the State's cash position, the timing of particular payments, the potential impact of delay, and the effect on the State's long term fiscal picture. It is, in short, a process that requires exercise of executive discretion on a constant basis.

13.     By law, the Governor must propose, and the Legislature must enact, a balanced budget. N.Y. Const. Art. VII, § 2; Legislative Law § 54(2)(a). The Governor's proposed budget submitted for Fiscal Year 2010-11, which the Legislature has not yet acted on, includes substantial recurring spending reductions and revenue increases affecting most areas of state government expenditures. Among the spending reductions, the proposed budget includes $250 million in savings from the State's workforce, which accounts for approximately 2.9% of the total gap closing plan. By comparison, personal service expenditures accounted for approximately 10.5% of governmental funds spending in FY 2009-10. Those savings were unspecified, to allow for negotiations with the collective bargaining representatives of State employees to determine the best way to achieve this outcome. However, efforts to achieve workforce savings have been thus far unsuccessful, as the collective bargaining representatives of State employees have declined to agree to any reductions in workforce costs.

14.     For this reason, and after curtailing numerous crucial State expenditures and taking a variety of other extraordinary measures to benefit the State's fiscal situation, some of which have become the subject of litigation, the Governor proposed in his second and subsequent emergency appropriation bills, and the Legislature enacted, a provision that authorized spending for the salaries and wages for State employees, except for the 4% salary increases that are at issue in this litigation. Similarly, the Governor proposed in his Sixth Emergency Appropriation bill, and the Legislature enacted, a provision to allow for a one day furlough for most State employees, with exceptions for employees providing direct care or who engage in functions essential for the protection of health and safety, and those who serve in Management/Confidential (M/C) positions or who are employed in positions that are fully funded by the Federal government. As set forth below, these proposals, coupled with numerous other cost-savings measures, are necessary to address both the State's current cash and fiscal crises and the current year deficit in an equitable and orderly manner. Most importantly, these measures were enacted as a last resort, after numerous other actions to reduce expenditures or increase revenues, and in the face of a worsening cash crisis and a long term structural deficit which will present even greater fiscal challenges in the years to come.

**The Budget Process**

15.     The Division works in conjunction with the Governor to prepare the Executive Budget submitted annually to the Legislature, pursuant to Article VII, § 2, of the New York Constitution. The Executive Budget includes a complete plan of expenditures and estimated revenues for the upcoming State fiscal year, accompanied by proposed appropriation bills and substantive legislation. Such budget bills require passage by both houses of the Legislature before they can become law.

16.     The Executive Budget must also include a series of plans, collectively known as the Financial Plan, which describe the State's resources and spending requirements. The Financial Plan contains estimates for the remainder of the fiscal year in which it is prepared, the forecast for the upcoming fiscal year based on the Executive Budget, and projections for the following three years (the "out-years"). The Plan's purpose is to assist the Legislature and the public in understanding the State's current operating forecast and the impact of the Governor's budget recommendations on State finances over a multi-year period.

17.     The Governor may submit amendments to the Executive Budget within 30 days pursuant to Article VII, § 3, of the State Constitution or, if practicable, within 21 days pursuant to State Finance Law § 22(16). The Governor may submit amendments thereafter, if they are accepted for filing by the Legislature.

### Overview of Recent State Budgets

18.     The national recession has had a severe impact on State finances, causing large, recurring budget gaps. In response, the State has taken repeated, diverse, and significant actions to eliminate the budget gaps and maintain balanced budgets. In 2008-09, the adopted budget closed a budget gap estimated at $5.2 billion. In 2009-10, the adopted budget closed a budget gap estimated at $17.9 billion, the largest budget gap ever faced by the State. Nonetheless, the State faces an estimated budget gap of $8.5 billion in the current fiscal year.

19.     In 2008-09 and 2009-10 the State adopted budgets that have required, among other things:

    a.   Significant recurring reductions in planned spending for, among other activities, aid public schools, payments to health care providers, property tax relief for

homeowners, aid to local governments, cost-of-living increases for human service providers, and State agency operations.

b.   Significant recurring tax and fee increases, including a temporary increase in the personal income tax, a tuition increase for public university students, an increase in assessments on public utilities, limitations on itemized tax deductions, and other measures.

c.   Use of various non-recurring resources, such as the use of existing fund balances, an approach that is not desirable from a long-term perspective, but did forestall even more severe reductions.

The actions were taken only after careful consideration and in full recognition of the negative impact they would have on a broad range of important governmental activities.

20.   Despite the substantial gap-closing actions taken in both the 2008-09 and 2009-10 adopted budgets, the State needed to take substantial corrective action during each of these fiscal years to manage budget gaps that subsequently emerged. The actions included, among other things, imposition of across-the-board reductions to State agency operations and local assistance payments, the use of available cash balances and other non-recurring resources, and targeted reductions to specific programs and activities.

**2008-09**

21.   In April 2008, the State adopted a budget for FY 2008-09 that closed a budget gap estimated at $5.2 billion. The actions taken to close the budget gap included, but were not limited to, imposition of substantial across-the-board reductions to State agency operations, reducing planned payments to health care providers, increasing Medicaid and tax fraud prevention and recovery efforts, slowing the phase-in of planned increases for a number of

8

programs, including the school tax relief program, increasing taxes on cigarettes, and using cash balances in other funds to support operations. See Exhibit 1.

22.    Nonetheless, during the course of the year, additional budget gaps emerged ultimately totaling over $2.2 billion. The State took repeated and substantial actions to address the budget gap during the year:

a.    In July 2008, the Division of the Budget identified an initial budget shortfall of $630 million and ordered development of a fiscal management plan to eliminate the gap. The fiscal management plan, which included actions that were within the Governor's power to implement, included an across-the-board reduction of approximately 7% to state agency operations, implementation of a statewide hiring freeze, and cancellation of all non-essential purchases. See Exhibit 2.

b.    In August 2008, the Governor and Legislature agreed to a package of savings actions totaling approximately $1 billion over two years that were intended to provide a reserve against potential revenue deterioration. Actions included Medicaid cost containment, 6% reductions to a range of local assistance programs, and other measures. See Exhibit 3.

c.    However, the dramatic economic events of September 2008, including Lehman Brothers' bankruptcy and the Federal rescue of AIG, caused immediate and severe damage to State finances. This led to an additional budget gap that would ultimately reach $2.2 billion. In addition, the potential gaps that needed to be addressed in the future increased dramatically.

d.    In response, the Governor and Legislature ultimately agreed on a Deficit Reduction Plan totaling $1.6 billion, with the balance of the gap closed by

extraordinary Federal aid authorized under American Recovery and Investment Act ("ARRA").

## 2009-10

23.     In 2009-10, the State adopted a budget that closed a budget gap estimated at $17.9 billion. This was the largest budget gap ever faced by the State. To eliminate the gap, the budget included (a) substantial reductions to, among other things, aid to public schools, payments to health care providers, elimination of the Middle-Class School Tax Relief program, elimination of cost-of-living increases for human service providers, and further reductions in agency operations, (b) substantial tax increases, including a personal income tax increase and tuition increases at the public universities, (c) extraordinary Federal aid, and (d) a range of non-recurring resources. In total, the budget included over $12 billion in recurring spending and revenue actions, with the balance of the gap closed with federal aid and non-recurring resources. See Exhibit 4.

24.     In spite of the unprecedented level of actions, an additional budget gap of over $4.4 billion emerged during the course of the 2009-10 fiscal year. In response, the State enacted a mid-year deficit reduction plan valued at approximately $2.8 billion. See Exhibit 5. A remaining budget shortfall of $1.6 billion was carried forward into 2010-11 as a result of the management of payments and must be addressed as part of the budget for 2010-11.

## 2010-11

25.     The budget gap that must be closed for FY 2010-11 now totals approximately $8.5 billion. The projected size of the budget gap for 2010-11 has grown each time the State updated its quarterly four-year Financial Plan projections. This is a clear indicator of the extraordinary uncertainties in the current economic and fiscal climate (for example, when the

State adopted the budget for 2009-10 in April 2009, it projected that the budget gap that would need to be addressed in 2010-11 would be approximately $2.2 billion).

26.     The Governor has proposed actions to eliminate the budget gap for 2010-11. The actions include (a) substantial reductions in, among other things, aid to public schools, the City of New York, public colleges and universities, Medicaid payments and other areas, (b) substantial increases in certain taxes, including a tax on sugar-sweetened beverages, and (c) certain non-recurring resources. See Exhibit 6. The Governor's plan for 2010-11 included unspecified savings that would reduce State employee workforce expenditures by $250 million.

### Future Budget Gaps

27.     The Governor's budget proposal included substantial recurring savings. However, the State still faces large, recurring budget gaps in future years. Under the Governor's plan, the budget gaps would total approximately $6 billion in 2011-12, $11 billion in 2012-13, and $13 billion in 2013-14.

28.     In short, there is no immediate end in sight for the substantial fiscal problems faced by the State.

### New York's Cash Flow Crisis and the Steps Taken to Address it

29.     The State's cash position is an indicator of its ability to make payments and overall fiscal health. The State has needed to regularly manage scheduled payments because the State's overall cash position has weakened substantially. The State's cash balances have declined substantially due to the recession, which has reduced the inflow of receipts, and to efforts to maintain balanced budgets, which have required the use of existing cash balances accumulated in prior years.

30.     The New York State financial plan encompasses a variety of fund categories and types. Most government functions are financed by "governmental funds," which include the General Fund; capital funds; debt service funds; and special revenue funds (such as federal funds) that are dedicated for particular purposes such as the fund used to receive and disburse Federal Medicaid reimbursements and the Mass Transit Operating Assistance Fund. The State also makes disbursements out of (a) proprietary funds, which include internal service funds used to account for the financing of goods or services supplied by one State agency to other State agencies or governmental units, and enterprise funds, used to account for operations that operate similarly to private business enterprises; and (b) fiduciary funds, which are generally funds held in trust by state officials for the benefit of others, such as the Tobacco Settlement Fund.

31.     The General Fund is the major operating fund of the State. It receives all State income not earmarked for a particular program or activity and not specified by law to be deposited in other funds. State income for Financial Plan purposes consists of moneys deposited to the credit of the General Fund and other funds during the fiscal year from current revenues (taxes, fees, and miscellaneous receipts including certain repayments of State advances) and transfers.

32.     The General Fund accounts for less than half of the State's Governmental Funds. In the FY 2009-10 budget, for example, General Fund disbursements totaled $52.2 billion, while disbursements from all governmental funds were $121.6 billion. Nonetheless, because other governmental funds are dedicated for particular purposes, many State functions can be supported only from the General Fund.

33.     The State's cash weakness significantly worsened in December 2009. December is historically a month when the State's cash on hand is relatively low, because substantial

payments for local aid, School Aid and Medicaid are made at that time, and the State had yet to receive what can be, depending on the year, a key revenue item: income tax paid on financial sector bonuses. On December 8, 2009, the Division projected that on December 11, after setting aside the funds to pay the December 15 School Aid and aid to local governments amounts in full, the closing balance in the General Fund would be negative by more than $1.4 billion. Even when all available STIP funds were used, DOB estimated that the State would be left with only a $81 million cash balance which is equal to approximately 0.07% of actual All Governmental Funds spending for FY 2009-10. That margin would have consisted entirely of the balances of funds that were available for temporary loans from the STIP.

34.     Based on the above estimates, I concluded that there was a significant risk the State would run out of sufficient available funds necessary to make its December payments. To prevent this eventuality, I delayed portions of School Aid and local assistance that were scheduled to be paid or before December 15 and a portion of the School Tax Relief ("STAR") scheduled to be paid on or before January 4.

35.     The delayed payments were as follows: $146 million in school aid; $436 million in STAR payments; $45 million in AIM payments; $47 million in state employee fringe benefit payments to insurance carriers; and $76 million in human services payments to counties.

36.     Were the State to run out of cash, the consequences would be dire. Such a scenario poses a very real risk that expenditures planned for the immediate future would be made in a chaotic and random fashion or not at all. Obligations would go unmet, subjecting the State to legal liability or a downgrading of its credit rating. In the case of school and local aid, some localities and districts would receive payment in full while others might get nothing, depending on the happenstance of when the particular payments were to be processed.

37.     By postponing these payments, I was able to ensure that the State retained a cash margin sufficient to meet other obligations – including state employee payroll and benefits – through the month of December.  On January 15, 2010 I determined the State had sufficient funds to pay the delayed expenses, and the payments were made.  In the interim, however, the School Boards Association, New York State United Teachers and other parties brought suit (Becker, et. al v. Paterson, et. al) to challenge the legality of my actions to ensure that the State maintained sufficient cash to meet its expenses, including payroll.  That litigation is still pending.

38.     In March 2010, I once again found that the State lacked the cash necessary to meet its expenses.  As a result, I delayed until June 1 the end-of-year payment of $2.06 billion in school aid, which was included in the budget for the 2009-10 fiscal year.  Under relevant law, the end-of-year payment may be prepaid in March, as has typically been the case.  Once again, the response to this action was another lawsuit.  Yet absent these measures, the State would likely have depleted its available cash in FY 2009-10.

39.     The State has available mechanisms that it can use to bolster the liquidity of the General Fund during periods when it does not have sufficient cash to meet payment obligations.  These include the ability to take temporary loans from the Short Term Investment Pool ("STIP"), which includes the State's "rainy day" funds and other available funds of the State.  This may be done for up to four months, or the end of the fiscal year, whichever period is shorter.  See State Finance Law §§ 92-cc(5) and 4(5).  This inter-month borrowing authority was first authorized in 2009-10, indicating the unique and severe nature of the State's cash position.  In addition, the State can issue General Obligation Tax and Revenue Anticipation Notes ("G.O.TRANs"), as permitted under State Finance Law § 55.

40.    The STIP is comprised of all governmental funds, proprietary funds and fiduciary funds, as well as two "rainy day" funds that are intended to help the State pay its liabilities in difficult fiscal times. The first such fund (known as the "Tax Stabilization Reserve Fund") was established pursuant to State Finance Law § 92, and contained just over $1 billion at the start of FY 2009-10. The second such fund (known as the "Rainy Day Reserve Fund") was established by State Finance Law § 92-cc, and may be used only under particular circumstances set by statute, such as during an "economic downturn." The Rainy Day Reserve Fund contained $175 million at the start of FY 2009-10.

41.    From time to time during 2009-10, there was a risk that the STIP could be depleted temporarily, leaving no available pool of money from which the State's expenditures could be made when other funds are exhausted.

42.    Further, I do not believe that the use of G.O.TRANs to address cash shortages is permissible in the absence of a balanced adopted budget for the fiscal year, and in any case would be unwise in light of the need to repay the notes within the fiscal year. As a result, the State has been forced to seek other means of cash management to address the current crisis.

### The Collective Bargaining Agreements

43.    Pursuant to Article 14 of the Civil Service Law ("the Taylor Law"), New York State public employees, with the exception of those employees designated as M/C, are divided into various bargaining units, represented by different unions. Those unions negotiate the terms and conditions of employment for those in their bargaining units, whether or not they are union members. Those terms and conditions are set forth in collective bargaining agreements, and are enacted into law in the form of "paybills" proposed by the Governor. Often, with some minor

15

variations, the collective bargaining agreement reached with one union representing members of the state civilian workforce will serve as a template for the other such unions.

44.      Upon the commencement of the term of Governor Eliot Spitzer in January 2007, collective bargaining agreements with the State's civilian unions were set to expire. At the time, the fiscal prospects for the State appeared bright.  An overview of the State's Financial Plan presented that month in Governor Spitzer's initial Executive Budget (FY 2007-08) noted that the State's "economic expansion entered its fourth year" the previous September, and that the Division projected "more moderate rates of economic growth" over the next four years.  DOB noted the State's "strong income performance" in 2006, and indicated that growth in tax receipts that fiscal year would approach 12 percent.  As a result of these trends, DOB noted that the state budget forecast had shown "commensurate improvement," and projected a current year budget surplus of $1.5 billion. *New York State Exec. Budget, Five Year Financial Plan 2007-8* at 10. While the plan foresaw deficits in future years, they were projected to be far more modest then those faced today.

45.      State and national financial indicators were also generally healthy.  The unemployment rate in New York State in January 2007 was 4.3%.  Real gross domestic product had grown by 3.2% in 2006, and was to achieve the same growth rate in 2007.

46.      During this period, when New York appeared to have a significant financial cushion, the State entered into negotiations with its primary civilian public employee unions on long-term collective bargaining agreements.  The first such agreement was reached in principle in October 2007 with CSEA, the largest union representing State public employees and the bargaining representative for the following collective negotiating units:  the Administrative Services ("ASA") Unit, the Institutional Services ("ISU") Unit, the Operational Services

16

("OSU") Unit and the Division of Military and Naval Affairs ("DMNA") Unit (collectively the "CSEA Agreements").

47.     Among other things, the CSEA Agreements provide for salary increases as follows: 3% effective April 5, 2007 for employees on the administrative payroll and March 29, 2007 for employees on the institutional payroll; 3% effective April 3, 2008 for employees on the administrative payroll and March 28, 2008 for employees on the institutional payroll; 3% effective April 5, 2009 for employees on the institutional payroll and March 29, 2009 for employees on the administrative payroll; and 4% effective April 2, 2010 for employees on the institutional payroll and March 25, 2009 for employees on the administrative payroll. ASU Unit Agreement §§ 7.1, 7.3 and 7.5; ISU Unit Agreement Article 7; OSU Unit Agreement Article 7; DMNA Unit Agreement Article 7.

48.     The references to the "institutional" payroll and the "administrative" payroll reflect the Comptroller's practice of staggering paychecks so that the "institutional" payroll and the "administrative" payroll are issued on alternating weeks. These designations are used solely for administrative convenience. Moreover, by agreement with the unions, most state employees are paid on a two-week lag basis. Thus, as reflected by the Comptroller's payroll schedule, the first institutional payroll of the 2010-11 fiscal year for employees that are paid on a lag basis covered the period beginning Thursday, March 25, 2010 and ending Wednesday, April 7, 2010, with the paycheck for that period issued on April 22, 2010. This applies to the members of the ASA, ISU, OSU and DMNA Units, who are represented by CSEA and who are paid from the institutional payroll.

49.     Pursuant to Civil Service Law § 204-a, the CSEA Agreements state: "It is agreed by and between the parties that any provision of this agreement requiring legislative action to

permit its implementation by amendment of law or by providing the additional funds therefore, shall not become effective until the appropriate legislative body has given approval." ASU Agreement Article 52; ISU Agreement Article 57; OSU Agreement Article 56; DMNA Unit Agreement Article 45.

50.     The CSEA Agreements were ratified by the CSEA membership on January 3, 2008. The Governor's Office, GOER and the Division drafted a paybill reflecting the provisions of the CSEA Agreements. CSEA was afforded an opportunity to review and discuss the draft, and approved the version that was submitted to the Legislature. The CSEA Agreement was approved by the Legislature by enactment of Part A of Chapter 10 of the Laws of 2008 (CSEA Paybill), signed into law by Governor Spitzer on January 28, 2008.

51.     The CSEA Paybill sets forth the general negotiated salary increases. With respect to the increase at issue, the paybill provides that "[e]ffective April 1, 2010 for officers and employees on the administrative payroll and effective March 25, 2010 for officers and employees on the institutional payroll, the basic annual salary of officers and employees in full-time employment status on the day before such payroll period, shall be increased by four percent adjusted to the nearest whole dollar amount." Chapter 10 of the Laws of 2008, Part A, § 8(5).

52.     The CSEA Paybill further provided as follows: "Notwithstanding any of the foregoing provisions of this section, any increase in compensation may be withheld in whole or in part from any employee to whom the provisions of this section are applicable when, in the opinion of the director of the budget and the director of employee relations, such increase is not warranted or is not appropriate." Chapter 10 of the Laws of 2008, Part A, § 8(13).

53.     The CSEA agreement set the pattern for other State public employee unions. In particular, the Public Employees Federation (PEF), representing the Professional, Scientific and

Technical Services Unit (PS&T Unit), reached a tentative agreement with the State on February 5, 2008 (PEF Agreement).

54.    The PEF Agreement sets forth provisions regarding compensation and pay raises. PEF Agreement Article 7.  As with the CSEA agreement, and pursuant to Civil Service Law § 204-a(1), the PEF Agreement contained a provision requiring legislative approval.  PEF Agreement Article 48.  Subsequent to its ratification, the Governor's Office, GOER and the Division drafted a paybill to implement the provisions of the PEF Agreement.  PEF was afforded an opportunity to review and discuss the draft, and approved the version that was submitted to the Legislature.  That bill was approved by the Legislature by the enactment of Chapter 114 of the Laws of 2008 (PEF Paybill).

55.    The PEF Paybill provided for salary increases parallel to those agreed to with CSEA, and further provides as follows:  "Notwithstanding any other provision of this section, any increase in compensation may be withheld in whole or in part from any employee to whom the provisions of this section are applicable when, in the opinion of the director of the budget and the director of employee relations, such increase is not warranted or is not appropriate." Chapter 114 of the Laws of 2008, § 3(14).

56.    Similar terms were negotiated with District Council 37, American Federation of State, County and Municipal Employee (DC 37), which is the collective bargaining representative for the Rent Regulation Services Negotiating Unit and is not a party to any of the actions before the Court.  That agreement was ratified and approved by the Legislature by the enactment of Chapter 49 of the Laws of 2008 (DC37 Paybill).

57.     The United University Professions (UUP) represents the State University Professional Services Negotiating Unit, which encompasses the faculty and non-teaching professional staff within the State University system.

58.     UUP and the State entered into a collective bargaining agreement for the period of July 2, 2007 to July 1, 2011 (UUP Agreement), which sets forth various terms including compensation.

59.     The Professional Staff Congress (PSC) represents non-classified employees of the City University of New York (CUNY). Upon information and belief, PSC and CUNY entered into an agreement for the period November 1, 2002 through September 19, 2007, and then executed a memorandum of understanding covering the period September 20, 2007 through October 19, 2010. These agreements (collectively "PSC Agreement") set forth various terms including compensation. The PSC agreement through September 19, 2007 was enacted into law as Chapter 208 of the Laws of 2009 on July 11, 2009.

60.     Although M/C employees do not participate in collective bargaining, they too were granted the same raises as to those received by CSEA and PEF via statute, in Chapter 10 of the Laws of 2008. See Chapter 10 of the Laws of 2008, Part B. That statute also set forth the proviso that any M/C salary increase could be withheld "when, in the opinion of the director of the budget, such withholding is necessary . . . to reduce state expenditures to acceptable levels." Chapter 10 of the Laws of 2008, Part B § 15(1).

61.     The annual pay increases provided for in these agreements understate the impact of the collective bargaining agreement on the compensation of employees in these bargaining units. The agreements also provide location pay, step increases, longevity bonuses and other

20

enhancements that can total, by the last year of the agreement, up to a 7% yearly increase for individual members of the bargaining unit.

## Details of New York's Revenue Crisis and Responses

62.     David Paterson was sworn in as Governor of New York State on Monday, March 17, 2008. By that date, the sunny fiscal forecasts for the State that had been made the previous year had begun to evaporate. The weekend before Governor Paterson's inauguration, Bear Stearns collapsed in astonishing fashion, losing 90% of its value in just two days. In the days that followed, AIG was faced with sudden insolvency. Then Lehman Brothers failed, as did many commercial banks. Extraordinary actions by the United States Department of Treasury and Federal Reserve became necessary to preserve the nation's financial system. The Troubled Asset Relief Program was created, Bear Stearns and AIG were bailed out with multi-billion dollar infusions of funds from the federal government. The economic slow down precipitated by the mortgage and housing crisis became known as the "Great Recession" and, as Governor Paterson observed, New York was its epicenter.

63.     New York unemployment rates, which had been 4.6% in January 2008, skyrocketed to 9% by December of the following year, and remained at 8.8% in February 2010, the most recent period for which final data is available. The December 2009 rate was the highest in New York State since 1983.

64.     These events had, and continue to have, a profound impact on the revenue base for New York State's program of expenditures and delivery of services. Over the past 15 years, the New York City financial district provided at least 20% of New York's tax base, although that proportion declined in 2008 as the securities industry suffered a severe downturn. The Wall Street enterprises from which such taxes are paid were hardest hit by the crisis, and revenues

from that sector were more severely constricted than in any period in recent history, including the aftermath of the 9/11 attacks and the bursting of the Internet bubble.

65.    States across the country face the most severe fiscal crises in their history. New York was no exception, and throughout 2008 and the winter of 2009, the State's revenues declined precipitously. Through the present date, the Governor has taken an extraordinary array of actions to ensure the stability of New York State's finances, and to maintain adequate cash flow to meet its obligations.

66.    The Governor has taken repeated measures to respond to the budget gaps using the powers at his disposal. On April 21, 2008, soon after enactment of the FY 2008-09 budget, Governor Paterson announced a hiring freeze, requiring approval for the Director of the Budget for many hires, except for those necessary for health and safety. (Budget Bulletin B-1182). That freeze has resulted in a reduction in the State workforce in agencies subject to control by the Executive from 137,680 to 131,696, a decline of almost 6,000 individuals.

67.    In August 2008, Governor Paterson called the Legislature into the first of several extraordinary sessions to address the growing budget gap. On the same day, he directed State agencies to decrease expenditures for the fiscal year by 7%, in addition to the 3.5% reduction that had already been made in the FY 2008-09 budget.

68.    The extraordinary session resulted in the enactment of a range of savings measures (Chapter 497 of the Laws of 2008). Among other provisions, the plan provided for reduction of member item spending by $50 million, increased authorization to transfer moneys to the General Fund from various special funds by $200 million; and enacted over $330 million in health care cuts, including the elimination of a cost of living adjustment for non-Medicaid services offered by early intervention providers and reduction in grants to public nursing homes

by $125 million. Altogether, the agreement provided for savings and revenues of over $400 million for FY 2008-09 and over $600 million for FY 2009-10.

69.     The FY 2009-10 Enacted Budget, adopted April 7, 2009, provided for spending of approximately $132 billion, of which $55 billion was from the General Fund, including transfers to other funds. The budget closed a deficit of approximately $17.9 billion through a series of spending reductions and revenue increases. The revenue increases included a four-year surcharge on the State income tax for high earners, which increased the marginal tax rate from 6.85% to 7.85% for filers with incomes above $300,000, and to 8.97% for filers with incomes above $500,000. The increased tax rate was estimated to bring in an additional $4 billion in revenue in FY 2009-10, and $4.7 billion in FY 2010-11.

70.     The FY 2009-10 Enacted Budget was based on revenue assumptions that were significantly lower than those in prior years, with mild economic recovery anticipated in the fourth quarter of 2009. However, recovery did not occur in 2009 and the State's revenues have continued to decline at unanticipated rates.

71.     The State began FY 2009-10 with approximately $1.9 billion less cash on hand in governmental funds than it had at the start of FY 2008-09. Through October 2009, cash in the State's governmental funds was $2.4 billion less than the amount for the same period of FY2008-09.

72.     From April to November 2009, revenues from the Personal Income Tax declined by 17.5%, a total reduction of more than $4 billion compared with the same period during the previous year.

73.     Moreover, during the same period, the amount of sales and use taxes collected declined by approximately 7%, a drop unprecedented since the inception of these taxes in 1965.

The State received lower revenues than projected in almost every month of 2009, contributing not only to the current deficit but also to a structural budget imbalance. Structural imbalance means that the State's recurring spending exceeds its recurring revenue. The State's structural imbalance has been exacerbated by previous attempts to address deficits through "one-shot" non-recurring savings or through borrowing.

74.     To address additional shortfalls that were identified in October, 2009, Governor Paterson directed state agencies to reduce expenditures on non-personnel services by 11% across-the-board, for a total savings of almost $500 million. This action resulted in a reduction in State agency expenses totaling $1.5 billion since the enactment of the FY 2008-09 budget. Since the labor costs provided for by the collective bargaining agreements were not affected, these cuts were effectuated via a wide array of program reductions and spending restraints, including:

- Requiring agencies to obtain prior approval of expenditures above certain threshold amounts;
- Implementing shared service opportunities for more efficient use of State resources, such as merging the human resources and fiscal operations of the Office of Real Property Services and the Department of Taxation and Finance;
- Expanding aggregate purchasing opportunities to leverage the State's buying power and decrease procurement costs, such as through bulk computer purchases;
- Consolidating leased office space, and more effective use of State-owned office space;
- Imposing a moratorium on overtime except for the provision of direct care services or the performance of functions necessary for the preservation of health or safety;
- Encouraging agencies to seek broader employee participation in voluntarily reducing their work schedules;
- Ensuring that temporary services contracts are used only for certain vital services and when cost effective;
- Requiring agencies to reduce travel through agency head review of long-distance travel and limiting employees to lowest cost travel option;
- Requiring agencies to cut back on printing costs;
- Requiring agencies to remove underutilized vehicles from service;
- Consolidating email architecture to reduce costs;
- Limiting temporary project jobs;
- Requiring agencies to maximize use of statewide equipment maintenance plans to reduce costs;

- Requiring agencies to use procurement cards to save on transaction costs and obtain rebates on purchases;
- Requiring future contractors to accept electronic payments, which reduces transaction, paper and mailing costs;
- Require agencies to work with outside auditors to obtain refunds on utility overcharges
- Reducing energy consumption  by requiring computers, printers and copiers to be "powered down" when not in use;
- Requiring agencies to use statewide contracts to reduce conference calling costs;
- Providing alternatives for agencies to reduce the cost of webcasting meetings; and
- Reducing the number of toll free numbers, the cost of those numbers and examination of ways to consolidate the State's call centers.

As has so often been the case, these efforts to achieve cost savings brought legal action.  PEF brought an "improper practice charge" against the Governor's effort to reduce agency travel, claiming it represented a departure from current practice.

75.    Further, on October 15, 2009, Governor Paterson proposed a Deficit Reduction Plan ("DRP") consisting of a number of legislative and administrative actions that would have reduced the FY 2009-10 projected cash deficit by $3.2 billion in FY 2009-10, with recurring savings in later years.

76.    On December 1, 2009, the Legislature passed some of the legislative components of the DRP proposed by the Governor and he signed them into law.  L.2009, ch. 501, 502 and 503.  This, together with the administrative actions, reduced the FY 2009-10 projected deficit by approximately $2.7 billion.  In addition to $500 million in agency reductions referenced above, these steps included, among others:

- A $390 million, 12.5 % across-the-board reduction to remaining 2009-10 fiscal year spending in certain local assistance programs, including social services, education and arts, health care, aging, mental hygiene, higher education, and transit.
- Targeted local assistance savings of $160 million, including reductions in Aid and Incentives to Municipalities (AIM) funding; anti-tobacco funding; elimination of the 2010 trend (inflation) factor for hospital, nursing home, home care, and personal care providers during the first quarter; delaying scheduled HEAL NY spending in the current year; lowering the State General Fund subsidies for the cost associated with mental health parity coverage;

reducing funding for managed care quality incentives, cervical cancer vaccines, emergency contraception, teacher centers, mortgage foreclosure assistance, a disease management demonstration program, pay-for-performance incentives to health care providers, and new shared services efficiency grants.

- The creation of a tax penalty forgiveness program, expected to generate $250 million in revenue.
- A transfer of $326 million in funds from Regional Greenhouse Gas Initiative proceeds, the Environmental Protection Fund, the Dormitory Authority and the Battery Park City Authority to the General Fund.
- $391 million in accelerated use of education stimulus funding.

77.     In sum, the State engaged in continuous efforts throughout this period to secure additional revenues and reduce expenditures in virtually every aspect of State spending. This included withholding all pay raises for 2009-10 for State M/C employees (who do not have a collective bargaining agreement), as well as longevity bonuses and merit awards, and further withholding of the 4% overall salary increase scheduled for FY 2010-11, for a total savings of $86.6 million. However, the one area where no significant savings were obtained in FY 2008-09 through FY 2010-11 was expenditures related to current unionized state employees.

### The 2010-11 Executive Budget

78.     Governor Paterson's proposed Executive Budget for FY 2010-11, including supplemental recommendations, eliminated a budget gap now estimated to be $8.5 billion.

79.     The State's deficit is anticipated to grow in future years, absent action to restore fiscal balance. At least one rating agency has made clear that if this situation is not addressed through spending restraint, New York State's credit rating could be downgraded. See New York State's Rating Under Threat, Moodys Says. See Exhibit 7.

80.     To close the yawning deficit, the Executive Budget proposed significant cuts, including nearly $1 billion in health care reductions, over $1.5 billion in school aid reductions, and a $325 million reduction in local aid. On the revenue side, the budget reflected significant

increases in the cigarette tax and the imposition of a tax on sugared drinks. The budget also included significant additional income tax revenues as a result of the temporary income tax surcharge added in the enacted FY 2009-10 budget.

81.     The Governor's Executive budget also included $250 million for unspecified General Fund savings. It was expected that such savings would be subject to negotiation with the unions representing the State workforce to achieve mutual agreement on personnel cost reductions, so that the State could close its revenue shortfall in the face of these extraordinary fiscal challenges. While various efforts were made to reach out to these collective bargaining agents, the unions indicated at an early stage that they would not agree to savings that would have an impact their members.

82.     The Senate and Assembly both passed "one-house" budget resolutions responding to the Executive budget proposal, the Senate on March 22 and the Assembly on March 24. Each of these resolutions adopted certain portions of the Executive Budget and rejected others. The legislative resolutions differed significantly from the Executive Budget, and from each other. When only those measures agreed upon by both houses and the Executive are counted, in excess of $3 billion in additional cuts or revenues are necessary to achieve a balanced budget. As a result, when FY 2009-10 ended on March 31, 2010, the State did not have a budget in place for FY 2010-11.

83.     Moreover, the revenue forecast consensus agreed to by the Senate, Assembly and Executive on March 1, identified a further deterioration in revenues. To eliminate the gap that had developed since submission of the Executive Budget in January, Governor Paterson proposed yet another $620 million gap closing measures on April 27, 2010, which included, among other measures:

- Reduction of $50 million in the member item account;
- Elimination of reimbursement provided under Timothy's Law ($40 million savings in 2010-11 and $50 million savings in 2011-12);
- Elimination of the New Technology Seed Fund, saving $25 million;
- Reduction of annual reimbursements to nonpublic schools, saving $28 million over two years;
- Reduction of NYSTAR Innovation Economy Matching Grants Program by $37 million over two years;
- Cuts to programs of the Office of Mental Retardation and Developmental Disabilities, the Office of Alcohol and Substance Abuse Services and the Office of Mental Hygiene , for total savings of $28 million;
- Disallowance of 50% of Business-Related Tax Credit Claims for savings of $750 million over two years; ·
- Increase of the tax on Tobacco Products/Snuff/Little Cigars Tax for $80 million in revenue of two years.

**The Emergency Appropriation Bills**

84.     On March 24, 2010, when it appeared that a budget would not be enacted by the April 1 start of the 2010-11 fiscal year, the Governor submitted bills to the Legislature for enactment of an emergency spending plan for the period April 1, 2010 to April 11, 2010.  The Legislature passed the bills (A.10468/S.7276 and A.10469/S.7277) and they became law on March 29, 2010 (Chapters 19 and 20 of the Laws of 2010 respectively).   These bills appropriated funds for "bare-bones" expenditures such as payroll, unemployment insurance, pharmaceutical coverage and veterans' benefits, to the extent necessary to keep the State functioning.

85. ·    The emergency spending bill included an appropriation authorizing payment of salaries and wages.  Chapter 20 of the Laws of 2010, § 2:  The legislation specifically prohibited the payment of any amounts for general salary increases for employees represented by CSEA, PEF and some other labor organizations that are not parties to the instant litigation.  It further provided that consistent with Chapter 10 of the Laws of 2008, Part A, § 8, Chapter 114 of the Laws of 2008, § 3, and Chapter 49 of the Laws of 2008, § 4, and notwithstanding any contrary

provision of law, including Article 14 of the Civil Service Law, or any collective bargaining agreement entered into by the State pursuant to such article, the amounts to be paid to employees of the executive branch for salaries and wages shall not be based upon amounts applicable pursuant to Civil Service Law §§ 130(1)(a)(4), 130(1)(c)(4) or 130(1)(e)(4) or Executive Law §§ 215(2)(a)(4), 215(2)(a)(8) or 216(2)(a)(4) to the extent those provisions provide for a general salary increase of 4%. See Chapter 35 of the Laws of 2010, § 2. The language excluding the general salary increases appeared in subsequent emergency spending bills, but was removed in the emergency bill submitted to the Legislature on May 14 in conformance with this Court's order.

86.     This legislation reflected a joint determination by the Director of Employee Relations and me that it would not be prudent to approve payment of general salary increases in light of the current fiscal crisis. By letter dated April 8, 2010, I advised the Office of the State Comptroller that that office should not process certain general salary increases scheduled for the institutional paycheck of April 22, 2010. See Exhibit 8. This was the date of the first institutional payroll of the 2010-11 fiscal year for the members of the ASA, ISU, OSU and DMNA Units represented by CSEA, as previously explained. The authority for this request derived from Chapter 10 of the Laws of 2008, Part A, § 8, Chapter 114 of the Laws of 2008, § 3 and Chapter 49 of the Laws of 2008, § 4. As the Governor has stated, the amount of the raises withheld, retroactive to April 1, 2010, once a budget is enacted for 2010-11.

87.     It is my understanding that, consistent with the Executive's intention to negotiate workforce savings with the union, prior to the submission of legislation withholding the pay increase and subsequent legislation imposing the furlough, officials in the executive chamber contacted the public employee unions, and sought their cooperation in finding personal services

savings that would help alleviate both the State's immediate cash crisis, and long term fiscal

crisis. In public statements, however, CSEA and PEF have explicitly rejected the call for any

concessions. See Unions Reject Calls to Forego Wage Hike, April 5, 2010, in

legislativegazette.com (PEF refusal to discuss changes to contract); An Open Letter to the People

of New York from Danny Donohue, May 9, 2010, in yonkerstribunet.com.

88.     The State has continued to operate under emergency spending bills. Less than

half of the money appropriated in these bills is paid out of the General Fund: $8.34 billion out of

a total of $18.38 billion to date. Over $6.5 billion has been from federal funds, such as amounts

received under the Federal American Recovery and Reinvestment Act.

89.     Despite the constrained nature of spending under these interim appropriation bills,

the State continues to face a cash crisis. Although the State limits expenditures in the emergency

appropriation bills, at this point in the budget negotiation process there are practical limitations

to the adoption of Executive Budget proposals. In particular, this process has not lent itself to a

comprehensive plan to address the State's deficit, such as is set forth in the Executive Budget.

90.     A number of significant payments come due in June and it appears that the State

simply will not have the funds available to make the full $2.06 billion final fiscal year school aid

payment that was not pre-paid in March when it comes due on June 1. To address the immediate

problem, legislation has been submitted that would delay this payment until June 30. But even

with such an additional delay, the State cannot meet other payment obligations that have also

been delayed.

91.     Based on the need for both short-term and long-term fiscal relief, the sixth

emergency appropriation bill submitted for the Legislature's consideration on May 7, 2010

included provision for a one day furlough for certain State employees.

30

### The Furlough Proposal

92.     Throughout this period of extreme financial difficulty, no measures were taken that impacted the provisions of the collective bargaining agreements. When Governor Paterson proposed a wage freeze in the budget for FY 2009-10, he indicated that it would only occur pursuant to a negotiated agreement, and when both CSEA and PEF stated explicitly that they would not agree to changes in their contracts, the proposal was not enacted.

93.     In the face of such opposition from unionized employees, the Governor had initially obtained workforce savings only through restricting the compensation increases received by M/C employees. Just after enactment of the FY 2009-10 State Budget, Director of Operations Dennis Whalen informed state agency and public authority heads by letter dated April 2, 2009 that all M/C pay increases would be withheld that year. The Executive Budget for FY 2010-11 also did not include funds for a pay increase for M/C employees, resulting in a savings of $86.6 million to the State over the two year period.

94.     It is my understanding that the absence of a pay increase for M/Cs since April 2008, while unionized employees have continued to receive pay increases, has had a negative impact on the State's ability to retain qualified executive personnel, and that numerous employees have declined to accept M/C positions, or have returned to unionized positions in which they formerly served, in light of the growing disparity in compensation.

95.     The absence of any permanent personnel savings from the unionized workforce in the face of both the immediate cash crisis, and the multi-year long term structural imbalance in the State's finances, has become increasingly untenable. As noted, in the past year and a half, the State has: (1) increased State income taxes by over $4 billion annually; (2) delayed school aid payments of over $2 billion; (3) withheld M/C pay increases totaling $86.6 million; (4)

31

withheld payments to insurers; (5) withheld payments to contractors; (6) cut $1.5 million from state agencies; and (7) closed budget gaps well in excess of $20 billion. Yet the State still faces an immediate cash shortfall, and even with the enactment of a final budget, it confronts future year deficits of extraordinary scope. Under these circumstances, additional personnel savings are essential.

96.     For these reasons, the Sixth Emergency Appropriation bill (Governor's Program Bill # 250) contained a proposal for a one day furlough for most State employees (for part-time employees, the furlough would be 20% of the work week). This proposal was estimated to result in savings of about $30 million per week, and further savings would be realized if the proposal was included in subsequent emergency appropriation bills. Every affected employee would have his or her schedule reduced by 20% between May 17 and 23, and would not be compensated for the amount of time spent on furlough. Employees engaged in direct care or whose functions are necessary for the preservation of health and safety were exempted. Positions fully funded by the federal government were also excluded, as there is no savings to be achieved for the State by reducing their work hours. Finally, the bill exempts M/C employees, as cuts in their pay have already achieved savings for the State. Inclusion of M/Cs in the furlough would result in additional savings of only $3.4 million, and could add to the State's retention and hiring difficulties caused by the failure to give pay increases to M/C employees over the past two years.

97.     The legislation provides that the furlough would not occur if an agreement is reached with the collective bargaining representative of the affected employees that provides "comparable personal service savings." Thus, alternative means of achieving the same goal are permitted, to provide flexibility. The Governor publicly stated that he will not seek to impose the furlough for more than an eight week period.

32

98.     Absent a negotiated alternative, a furlough is beneficial since it results in permanent savings which address the State's long-term fiscal shortfall, rather than (as is the case in a pay lag) borrowing from employees with a future obligation to repay, and thus producing a negative overall fiscal impact.

**Plaintiffs' Proposed Alternatives**

99.     Plaintiff Kenneth Brynien contends that the steps taken to reduce workforce expenditures are unnecessary, because sufficient savings can be achieved through other alternatives. The proposals he advances, however, would not accomplish this goal. In several instances they would involve the investment of additional funds that the State does not possess, in the unproven hope that down the road further, savings might materialize. But these potential savings are, in most cases, a chimera.

100.    Brynien first cites the pension reform enacted by Chapter 504 of the Laws 0f 2009, and the State's estimate that it would result in $35 billion in savings over 30 years (a figure that reflects savings to both the State and localities), as evidence that the savings had already been provided by the current State workforce. That enactment will, indeed, produce enormous financial relief to the State and localities over the long term. But, in conformance with the constitutional ban on diminishing pension benefits, the law applies only to new employees. As a result – and as stated in the Division's estimates prior to enactment – it produces very little savings in the first several years. In the FY 2010-11 budget, the total savings from pension reform are estimated at $10 million for the State.

101.    Second, Brynien contends that an additional 1,000 individuals were willing to accept the $20,000 severance incentive offered by the State to employees who would leave the payroll by November 11, 2009. But he offers no evidence that providing the incentive to such

individuals would have saved – rather than cost – money.  An incentive program both imposes costs (in terms of earlier payment of pension benefits and the cost of the incentive itself) and can produce benefits (in terms of potentially reduced payroll and annual pension benefits).  For this reason, the incentive was a targeted one, which allowed discretion to the Executive to select the individuals for whom savings would be achieved.  Those who were believed likely to depart anyway were not offered the incentive, since it would simply have provided a bonus to the departing employee at a cost to the State.  Similarly, those in positions that would need to be refilled because of the essential nature of the duties performed were not given the payment to depart, since no savings would thereby have been achieved.  Simply asserting that other individuals would have taken the State's payments does not demonstrate that any savings at all would thereby have been achieved.

102.    Third, Brynien states that the State could save $656 million over the next three years by instituting a "consultant reduction plan," a contention made in a report by PEF ("the Tip of the Iceberg") released earlier this year.  By "consultants," Brynien means any individual that provides personal services to the State (such as bridge inspection, auditing or information technology) pursuant to contract, rather than as a permanent employee.  For numerous reasons, the assertion that such additional savings are readily available in this area is simply wrong.

103.    The Executive Branch has already taken significant steps to reduce consultants, including a directive to agencies that they reduce non-personal services by 10%, the convening of the Governor's Task Force on Personal Services Contracting, and a major initiative (based on Chapter 500 of the Laws of 2009, a statute which the Executive Chamber prepared cooperatively with PEF) to "in-source" Information Technology services.  Experience with the latter has indicated that, while savings can be realized in certain instances in replacing contractors with

public employees, the General Fund savings to be achieved thereby are a small fraction of those suggested by PEF. Moreover, as the Task Force report noted, there are significant obstacles – such as the limits on hiring and promotion created by the State's civil service system – which often prevent the State from obtaining the skills it needs via the public workforce. Further, the purported savings are premised on numerous flawed assumptions, including that contractors work the same 37.5 hours worked by State employees, and that they get paid for the entire length of the contract, rather than simply for time worked.

104.    Finally, PEF's estimates of contractor expenses are also deeply flawed. For example, the "Tip of the Iceberg" report concluded that the State spends $2.9 billion annually on consultants, a figure wholly at odds with the calculations in the State budget, and apparently premised on such calculations as the inclusion of $1.6 billion in expenditures for "other services" on reports filed with the Comptroller as encompassing personnel costs. Thus, while the State has replaced contractors when fiscally warranted, it has found no evidence to support the extraordinary savings claims PEF proffers.

105.    Fourth, Brynien states that savings could be achieved by hiring new employees and limiting overtime. The State has given a directive to its agencies to limit overtime to essential instances. But, in any event, Brynien offers no evidence that the new personnel hired will have the appropriate experience to handle tasks now being addressed through overtime duty performed by more experienced workers. What is clear is that hiring more employees will have an immediate and negative cost impact on the State; the manner in which these new hires will result in sufficient savings to offset the costs of their employment, much less save money for the State, is left entirely unspecified.

106.    Fifth, Brynien contends that significant savings could be achieved through the Voluntary Reduction in Work Schedules ("VRWS") Program if the State gave it the requisite support. Contrary to his claim, the Executive has repeatedly directed agencies to make use of VRWS where appropriate. The Director of State Operations has issued two separate memoranda to this effect and Budget Bulletin D-1124, issued July 22, 2009, gave the same directive. The Division estimates that $5 million to $10 million in All Funds savings was achieved through this program in FY 2009-10. Such savings, however, are not separately indicated in the budget but are reflected in each agency's individual budget. See Exhibit 9.

107.    Finally, Brynien suggests that the State could implement a Workforce Injury Reduction Program and, by cutting injuries by 20%, save $45 million in direct and indirect costs. He provides no evidence for this calculation. Reducing injuries in the workplace is a worthy goal, but stating that there should be a "program" to achieve this end will not make it so, nor will it extricate the State from its immediate cash deficiency.

### The Employee Benefit Fund

108.    The CSEA Agreements with the State and with the Unified Court System a for 2007-2011 ("SJU Agreement") also provide for the continuance of the Employee Benefit Fund ("EBF") to provide health and welfare benefits, including but not limited to dental care and vision care, to CSEA-represented employees. The EBF is a Internal Revenue Code § 501(c)(9) Trust, managed by a Board of Trustees comprised of CSEA members and chaired by CSEA's President.

109.    Pursuant to the CSEA Agreements and the EBF Contract, the State is to deposit in the EBF an amount equal to $250 per employee for each quarter of the year beginning April 1, 2010 and thereafter. Pursuant to the SJU Agreement and the SJU EBF Contract, effective April

1, 2010, the State is to contribute on a quarterly basis to the EBF a pro rata annual sum of $1,255 per active employee and a pro rata sum of $627.50 for part-time and per diem employees. The State must also contribute on a quarterly basis a pro rata sum of $885 per employee retired since April 1, 1998. The total deposits would amount to $17.4 million for the CSEA Agreements and $9.2 million for SJU Agreement.

110. The CSEA Agreements specify that "such amounts must be deposited as soon as practicable after the first day of each quarter." In its affidavit, CSEA alleges that, as a result of such agreement, its funds will be exhausted on July 1, 2010. It presumes, in such filings, that (a) no payments will be made by that date; and (b) that the temporary withholding of payments will result in the immediate cessation of benefits. It presents no evidence for either of these points, or specifics about what harm may come to employees who receive health care benefits through the union operated program.

111. Put simply, the State simply lacks the funds to make payments of such benefit expenses at this time. Such withholding is not a permanent abandonment of such payments, but a delay pending an improvement in the State's cash position.

\*       \*       \*

112. In sum, the State has turned to the measures at issue in this litigation after extraordinary efforts to restrain spending and increase revenues, and in the midst of drastic cash and fiscal crises that have struck nationwide, and that demand immediate solutions in the absence of an enacted budget. Under these circumstances, the measures adopted by the State that are under challenge in this litigation, in conjunction with so many other steps undertaken in fiscal prudence, are a reasonable means of addressing these concerns.

_Robert L Megna_

ROBERT L. MEGNA

Sworn to before me this
18+h day of May, 2010

_Lisa Ullman_

Notary Public

LISA ULLMAN
Notary Public, State of New York
No. 02UL5056756
Qualified in Albany County
Commission Expires March 11, 20__14

38